UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF CARLSBAD, a California municipal corporation; and CARLSBAD PUBLIC FINANCING AUTHORITY, a California joint powers authority, | Civil No. 08cv1211 AJB (WMc) |
| Plaintiff, | FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING BENCH TRIAL AND JUDGMENT THEREON |
| v. | |
| PRINCE REZA SHAH, an individual, | |
| Defendants. | |

This matter having come on for trial before the bench on July 11, 2011, and the Court having heard the testimony of witnesses and received evidence, the Court makes the following Findings of Fact, and Conclusions of Law based upon the admissible evidence, and enters Judgment thereon as follows:

## *FINDINGS OF FACT*

### *I. The Parties*

1.     Plaintiff and Counter-Defendant, the City of Carlsbad (the "City"), is a California corporation. The Carlsbad City Council is the city's legislative body, which inter alia enacts ordinances, sets policies through resolutions, and adopts an annual budget.  The Carlsbad City Council meetings are televised live via cable television and are also transmitted live on the City's website. (Stipulated Fact (hereinafter "SF") No. 3.)

2.     The Carlsbad Public Financing Authority ("CPFA") is a joint powers authority which was formed for the purpose of financing and operating the City's municipal golf course.  It is also a licensee of the City of Carlsbad's trademarks and copyrights that are at issue in this case.  (SF No. 4.)

3.     The Defendant, Prince Reza Shah ("Shah"), is an individual who resides in the City of Carlsbad.  Shah does not have any formal affiliation with the City of Carlsbad, the Carlsbad Public Financing Authority,[1] or the City's municipal golf course.  (SF No. 5.)

## II. Jurisdiction

4.     This Court has jurisdiction over this action.  The federal claims alleged in this Complaint arise under the Copyright Laws of the United States, 17 U.S.C. § 101 *et seq.*, the Lanham Act, 15 U.S.C. § 1051 *et seq.*, and the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.  This Court has subject matter jurisdiction over those claims under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338(a), and over the related state causes of action under 28 U.S.C. §§ 1338(b) and 1367(a).  (SF No. 1.)

5.     This Court has personal jurisdiction over the defendant in this action pursuant to 28 U.S.C. §§ 1331, 1391 and 1400 because the Defendant resides in this judicial district (in Carlsbad, California) and regularly conducts business in this judicial district.  (SF No. 2.)

## III.  Procedural History

6.     On July 7, 2008, the City brought its complaint against Shah for copyright infringement, cybersquatting, unfair competition in violation of the Lanham Act, unfair competition in violation of California's Business & Professions Code section 17200 *et seq.*, common law unfair competition, and declaratory judgment of trademark rights.

7.     In return, Shah filed a counterclaim against the City seeking a declaration that his trademark rights are superior to that of the City's and seeking an injunction against the City from further utilizing the marks.

8.     During the course of the litigation, the City brought a motion for partial summary judgment which, after oral argument, was decided on October 20, 2009.  This Court granted the City's

---

[1] The City and the CPFA will be collectively referred to by the Court as "the City" herein.

08cv1211

motion for partial summary judgment. (Doc. No. 26.)  In granting the motion, the Court declared that the City is the rightful owner of the trademarks and logo at issue in the case and authorized the United States Patent and Trademark Office ("USPTO") to register the City's pending trademark applications and to deny registration of Shah's application of the marks and his Marbrisa logo.  *Id.*

9.     The City's trademarks "the Crossings at Carlsbad" and "TCAC" and logo for these were officially registered with the USPTO in November 2010.

**IV.    *FACTS TO WHICH THE PARTIES HAVE STIPULATED***

*A. Naming of the City's Golf Course*

10.    Beginning at least as early as 1990, the City began planning a municipal golf course to be located within the City.  The City began construction in 2005, and continuously constructed the golf course and its accompanying buildings and facilities through July 2007. (SF No. 6.)

11.    At a June 6, 2006, public City Council meeting, the City announced its plan to solicit names from the public and invited people to submit proposed names within a specified period of time.  At that meeting, the City announced its intention to publicly unveil the chosen name for the golf course on October 18, 2006.  The City also hired marketing consultants and experts in the industry of promoting and branding golf courses to assist the City in choosing a name for the golf course.  (SF No. 7.)

12.    On September 5, 2006, a committee formed to evaluate names proposed by the public selected the name "The Crossings at Carlsbad" as its final recommendation.  (SF No. 8.)

13.    At an October 17, 2006, public City Council meeting, the City formally announced its selection of "The Crossings at Carlsbad" as the final recommended name for the golf course. (SF No. 9.)

14.    On November 21, 2006, the City Council formally adopted the name "The Crossings at Carlsbad" for the City's new golf course at a public City Council meeting. (SF No. 10.)

15.    Shah was present at the City Council meeting at which the City Council formally adopted the name "The Crossings at Carlsbad" for the City's new golf course. (SF No. 11.)

16.    TCAC is an acronym developed by the City to further identify the golf course and related goods and services. (SF No. 12.)

08cv1211

1  ///

2  ///

3  **B.      The City's Development of the Logo**

4  17.   In December 2006, the City began working on the development of a logo for use with the marks

5       "The Crossings at Carlsbad" and "TCAC" (together herein, "the Marks.") (SF No. 13.)

6  18.   On February 5, 2007, during a public City Council meeting, City employees and consultants

7       formally presented the City Council with the logo (the "Logo") that officially became the Logo

8       for the City's golf course. (SF No. 14.)

9  19.   On March 1, 2007, the City formally adopted the Logo for the golf course at a public City

10      Council meeting. (SF No. 15.)

11 **C.      The City's Use of the Marks and Logo**

12 20.   On September 11, 2006, an agent acting on behalf of the City registered several domain names

13      on the City's behalf, including: www.thecrossingsatcarlsbad.com,

14      www.thecrossingsatcarlsbadgolfclub.com, and www.thecrossingsgolfclubatcarlsbad.com. (SF

15      No. 16.)

16 21.   On October 18, 2006, the day following the City Council meeting at which the recommended

17      name was announced, the North County Times newspaper published an article titled "Carlsbad

18      Releases Golf Course Name," which identified "The Crossings at Carlsbad" as the name

19      recommended for the City's golf course. (SF No. 17.)

20 22.   On November 21, 2006, the same day the City Council formally adopted the name "The

21      Crossings at Carlsbad" for its new golf course and announced the selection of the name during a

22      City Council meeting, the City issued a press release announcing the adoption of the name "The

23      Crossings at Carlsbad" for its new golf course. (SF No. 18.)

24 23.   On November 22, 2006, the San Diego Union Tribune published an article reporting on the City

25      Council's selection of "The Crossings at Carlsbad" as the name of its golf course.  (SF No. 19.)

26 24.   In January 2007, the City and its agents began ordering and distributing marketing materials

27      using the name "The Crossings at Carlsbad" and provided such name as the name of its golf

28

08cv1211

1    course for publication on the "San Diego Golf Map," which was distributed in late January and

2    early February 2007. (SF No. 20.)

3    25.    In February 2007, the City and its agents marketed its golf course through the Carlsbad Chamber

4    of Commerce, the Carlsbad Conventions and Visitors Bureau and San Diego Golf Expo under

5    the name "The Crossings at Carlsbad." (SF No. 21.)

6    26.    In February 2007, the City and its agents also ordered merchandise, such as golf balls and pens,

7    which included the Marks and the Logo. (SF No. 22.)

8    27.    The March 4, 2009, issue of Fore Magazine contained a half-page ad for the City's golf course

9    under the name "The Crossings at Carlsbad." (SF No. 23.)

10   28.    On March 9, 2009, the name "The Crossings at Carlsbad" and the Logo were displayed by the

11   City and the City's agents at San Diego Golf Fest at the Del Mar fairgrounds, and brochures for

12   the City's golf course bearing the name "The Crossings at Carlsbad" and the Logo were

13   distributed to the public. (SF No. 24.)

14   29.    On March 15, 2007, the City and its agents officially launched the

15   www.thecrossingsatcarlsbad.com website which included, among other things, the Marks and

16   the Logo. (SF No. 25.)

17   30.    On August 2, 2007, the City's golf course pro shop (operated by the City's licensee) began

18   selling clothing, golf balls, and other items bearing the Marks and the Logo. (SF No. 26.)

19   31.    On August 5, 2007, the City's golf course opened for play by Carlsbad residents and was opened

20   to the general public on August 11, 2007.  (SF No. 27.)

21   32.    At all times, the golf course has operated under the name "The Crossings at Carlsbad."  Kemper

22   Sports Management ("Kemper") is a licensee of the City's Marks and the Logo.  Kemper

23   operates the City's golf course, pro shop and related facilities for the City and on the City's

24   behalf. (SF No. 28.)

25         **D.    *The City's Trademark Applications***

26   33.    While the City and its agents were already using the marks "THE CROSSINGS AT

27   CARLSBAD" and "TCAC" for its golf course and related goods and services, it filed nine Intent

28   to Use ("ITU") trademark applications with the USPTO for the Marks and Logo.  The

08cv1211

applications were for Class 25 (golf clothing), Class 28 (golf accessories) and Class 41 (golf-related entertainment). (SF No. 29.)  The following is a list summarizing the dates and substance of the City's ITU trademark applications.

(a)    On July 16, 2007, the City filed an Intent to Use trademark application for "TCAC," in Class 25, for:  golf spikes; golf trousers; belts; caps; jerseys; ties; tops; sweat bands; sweat pants; sweat shirts; sweat suits; athletic shoes; vests; socks; jackets; rain jackets; waterproof jackets and pants; wind resistant jackets; visors; skirts and dresses; pants; dress shirts; knit shirts; polo shirts; shirts; and sport shirts (application Serial No. 77/230,889).

(b)    On July 16, 2007, the City filed an Intent to Use trademark application for "THE CROSSINGS AT CARLSBAD," in Class 25, for:  golf caps; golf cleats; golf shirts; golf shoes; golf spikes; golf trousers; belts; caps; jerseys; ties; tops; sweat bands; sweat pants; sweat shirts; sweat suits; athletic shoes; vests; socks; jackets; rain jackets; waterproof jackets and pants; wind resistant jackets; visors; skirts and dresses; pants; dress shirts; knit shirts; polo shirts; shirts; and sports shirts (application Serial No. 77/230,864).

(c)    On July 26, 2007, the City filed an Intent to Use trademark application for "THE CROSSINGS AT CARLSBAD," in Class 28, for:  divot repair tools; fitted covers for non-motorized golf carts; fitted head covers for golf clubs; golf accessory pouches; golf bag covers; golf bag pegs; golf bag tags; golf bags; golf ball markers; golf ball retrievers; golf ball sleeves; golf balls; golf club bags; golf club covers; golf club grips; golf club heads; golf club inserts; golf club shafts; golf club swing aids, namely golf club balancing scales and scale parts thereof, to analyze, fit and/or make golf clubs; golf clubs; golf flags; golf gloves; golf irons; golf putter covers; golf putters; golf tee markers; golf tees; golf towel clips for attachment to golf bags; golf training equipment, namely, a golf training cage; grip tapes for golf clubs; hand grips for golf clubs; head covers for golf clubs; non-motorized golf carts; and putting practice mats (application Serial No. 77/240,017).

(d)    On July 25, 2007, the City filed an Intent to Use trademark application for "THE CROSSINGS AT CARLSBAD," in Class 41, for: entertainment in the nature of golf tournaments; fitting of golf clubs to individual users; golf caddie services; golf club services; golf courses; golf driving range services; golf instruction; providing a website through which golfers reserve tee times at golf courses; providing golf facilities; and rental of golf equipment (application Serial No. 77/238,790).

(e)    On July 24, 2007, the City filed an Intent to Use trademark application for "TCAC," in Class 28, for: covers for golf clubs; divot repair tools; fitted covers for non-motorized golf carts; fitted head covers for golf clubs; golf accessory pouches; golf bag covers; golf bag pegs; golf bag tags; golf bags; golf ball markers; golf ball retrievers; golf ball sleeves; golf balls; golf club bags; golf club covers; golf club grips; golf club heads; golf club inserts; golf club shafts; golf club swing aids, namely golf club balancing scales and scale parts thereof, to analyze, fit, and/or make golf clubs; golf clubs; golf flags; golf gloves; golf irons; golf putter covers; golf putters; golf tee markers; golf tees; golf towel clips for attachment to golf bags; golf training equipment, namely, a golf training cage; grip tapes for golf clubs; hand grips for golf clubs; head covers for golf clubs; non-motorized golf carts; and putting practice mats (application Serial No. 77/235,270).

(f)    On November 9, 2007, the City filed an Intent to Use trademark application for "TCAC," in Class 41, for:  entertainment in the nature of golf tournaments; fitting of golf clubs to individual users; golf caddie services; golf club services; golf courses; golf driving range services; golf instruction; providing a website through which golfers locate information about golf courses and golf tournaments; providing a website through which golfers reserve tee times at golf courses; providing golf facilities; providing news and information on the sport of golf; and rental of golf equipment (application Serial No. 77/326,199).

(g)    On August 24, 2007, the City filed an Intent to Use trademark application for the Logo, in Class 28, for:  divot repair tools; fitted covers for non-motorized golf carts; fitted head covers for golf clubs; golf accessory pouches; golf bag covers; golf bag pegs; golf bag tags; golf bags; golf ball markers; golf ball retrievers; golf ball sleeves; golf balls; golf club bags; golf club covers; golf club grips; golf club heads; golf club inserts; golf club shafts; golf club swing aids, namely golf club balancing scales and scale parts thereof, to analyze, fit and/or make golf clubs; golf clubs; golf flags; golf gloves; golf irons; golf putter covers; golf putters; golf tee markers; golf tees; golf towel clips for attachment to golf bags; golf training equipment, namely, a golf training cage; grip tapes for golf clubs; hand grips for golf clubs; head covers for golf clubs; non-motorized golf carts; and putting practice mats (application Serial No. 77/263,971).

(h)    On August 24, 2007, the City filed an Intent to Use trademark application for the Logo, in Class 25, for:  golf caps; golf cleats; golf shirts; golf shoes; golf spikes; golf trousers; belts; caps; jerseys; ties; tops; sweat bands; sweat pants; sweat shirts; sweat suits; athletic shoes; vests; socks; jackets; rain jackets; waterproof jackets and pants; wind resistant jackets; visors; skirts and dresses; pants; dress shirts; knit shirts; polo shirts; sport shirts; and shirts (application Serial No. 77/263,925).

(i)    On August 24, 2007, the City filed an Intent to Use trademark application for the Logo, in Class 41, for:  entertainment in the nature of golf tournaments; fitting of golf clubs to individual users; golf caddie services; golf club services; golf courses; golf driving range services; golf instruction; providing a website through which golfers locate information about golf courses and golf tournaments; providing a website through which golfers reserve tee times at golf courses; providing golf facilities; and rental of golf equipment (application Serial No. 77/263,996). (SF No. 30.)

### E.    The City's Copyright Registration of the Logo

34.    The City owns the copyright in the Logo and has secured the exclusive rights and privileges to the copyright by registering the same with the United States Copyright Office.  (SF No. 31.)  The effective date of the City's copyright registration for the Logo is March 31, 2008. (SF No. 32.)

### F.    Shah's Registration of Domain Names

35.    Starting in November 2006 after the Carlsbad City Council meeting at which the City formally adopted the name "The Crossings at Carlsbad" for its new golf course, Shah registered a number of domain names which incorporate and/or are similar to the marks "THE CROSSINGS AT CARLSBAD" and/or "TCAC." (SF No. 33.)

36.    Shah has registered several domain names that incorporate these marks and end in ".mobi." Domain names ending in ".mobi" first became available for public registration on September 26, 2006.

37.    A list of domain names registered by Shah which incorporate and/or are similar to the marks "THE CROSSINGS AT CARLSBAD" and/or "TCAC" and the dates of registration is below.

### Domain Names Registered by Shah

| Domain | Date of Registration |
| --- | --- |
| (a)    www.thecrossingatcarlsbad.com, | 11/21/2006 |
| (b)    www.thecrossingsatcarlsbad.mobi, | 11/22/2006 |

08cv1211

| | | |
|---|---|---|
| (c) | www.thecrossingatcarlsbad.net, | 11/21/2006 and again on 02/14/09 |
| (d) | www.thecrossingsatcarlsbadinc.mobi, | 12/14/2006 |
| (e) | www.golfthecrossingatcarlsbad.com, | 11/29/2006 |
| (f) | www.golfthecrossingatcarlsbad.mobi, | 11/29/2006 |
| (g) | www.golfthecrossingatcarlsbad.net, | 11/29/2006 |
| (h) | www.golfthecrossingsatcarlsbad.com, | 11/21/2006 |
| (i) | www.golfthecrossingsatcarlsbad.mobi, | 11/22/2006 |
| (j) | www.golfthecrossingsatcarlsbad.net, | 11/21/2006 |
| (k) | www.tcac.mobi, | 11/22/2006 |
| (l) | www.tcacgolf.com, | 11/26/2006 |
| (m) | www.tcacgolf.mobi, | |
| (n) | www.tcacgolf.net | 11/26/2006 |
| (o) | www.golftcac.mobi | 11/27/2006 |
| (p) | www.crossingsatcarlsbad.com | 11/28/2006 and again on 2/23/09 |
| (q) | www.crossingsatcarlsbad.net | 11/28/2006 and again on 2/19/09 |
| (r) | www.crossingatcarlsbad.com | 11/29/2006 |
| (s) | www.crossingsatcarlsbad.mobi | 11/29/2006 and again on 2/15/09 |
| (t) | www.thecrossingatcarlsbad.mobi | 11/29/2006 and again on 2/14/09 |

(SF 35)

38.     Prior to registering the domain names listed above, Shah was aware that the domain name

thecrossingsatcarlsbad.com had already been registered by someone else.  (SF No. 36.)

39.     In total, Shah has registered more than 400 domain names. (SF No. 36.) The domain names

registered by Shah include the following which he registered in October and November 2006:

| | |
|---|---|
| www.dealornodeal.mobi, | www.sheratoncarlsbadresort.mobi, |
| www.trump-golf.mobi, | www.fourseasonsresort.mobi, |
| www.sheratoncarlsbadresort.net, | www.tiger-woods.mobi, |
| www.americasgottalent.mobi, | www.twenty20restaurant.mobi, |
| www.parishiltons.mobi, | www.americansidol.mobi, |
| www.shaunwhite.mobi, | www.karlstrauss.mobi, |
| www.admob.mobi, | www.rustysurfboards.mobi, |
| www.kempersports.mobi, | www.marriots.mobi, |
| www.remaxrealty.mobi, | www.hiltons.mobi, |
| www.coldwelbanker.mobi | www.prudentialrealty.mobi |
| www.sheratoncarlsbad.com, | |

(SF No. 38.)

### G.     *Shah's Trademark Applications*

40.     Between November 30, 2006 and September 20, 2007, Shah filed five ITU trademark

applications with the USPTO related to the marks "THE CROSSINGS AT CARLSBAD," "TCAC," and

one (the "Marbrisa Logo") which incorporated the City's Logo. (SF No. 39.)  A list summarizing the

dates and substance of Shah's ITU trademark applications are set forth below.

Shah's Trademark Applications

08cv1211

(a)     On November 30, 2006, Shah filed an ITU trademark application for "THE CROSSINGS AT CARLSBAD," in Class 25, for clothing, namely men's and women's golf caps and golf shirts (application Serial No. 77/054111).

(b)     On November 30, 2006, Shah filed an ITU trademark application for "TCAC," in Class 25, for clothing, namely men's and women's golf caps and golf shirts (application Serial No. 77/054126).

(c)     On December 11, 2006, Shah filed an ITU trademark application for "TCAC," in Class 28, for golf balls (application Serial No. 77/061706).

(d)     On June 7, 2007, Shah filed an ITU trademark application for "THE CROSSINGS AT CARLSBAD," in Class 41, for golf courses (application Serial No. 77/202046).

(e)     On June 12, 2007, Shah filed an ITU trademark application for "THE CROSSINGS AT CARLSBAD," in Class 28, for golf balls, golf clubs and golf tees (application Serial No. 77/203754).

(f)     On September 20, 2007, Shah filed an ITU trademark application for a  "Marbrisa" logo (the "Marbrisa Logo"), in Class 25, for hats, caps, golf shirts, and T-shirts (application Serial No. 77/284659).

(SF No. 40.)

41.     The Marbrisa Logo was copied from the Logo being used for the City's golf course. (SF No. 41.) The Marbrisa Logo and the City's Logo are identical in all respects except for the replacement of the word "Marbrisa" for the word "Carlsbad."  (SF No. 42.)

42.     All five of Shah's above-referenced applications for trademark registration were the subject of opposition proceedings initiated by the City before the USPTO Trademark Trial and Appeals Board ("TTAB"). (SF No. 43.)

43.     All of Shah's applications for trademark registration, (Application Serial No. 77/054111; Application Serial No. 77/054126;  Application Serial No. 77/061706; Application Serial No. 77/202046; Application Serial No. 77/203754; Application Serial No. 77/284659) were abandoned on March 3, 2010.

### H.     Shah's Formation of California Corporations

44.     Shah formed the California corporations "The Crossings at Carlsbad" (Corporation No. C2990140) and "The Crossings at Carlsbad Golf Course" (Corporation No. C2990139) on April 4, 2007, (SF No. 44.) and formed the California corporation "TCAC" (Corporation No. C2992078) on August 28, 2007. (SF No. 45.)  Shah is the sole owner, officer, director, and agent for service of process of each of the aforementioned corporations.  (SF No. 46.)

### I.     Other Activities by Shah

45.     Shah has purchased Yellow Pages telephone directory listings using the name "The Crossings at Carlsbad Golf Course."  (SF No. 47.)

46.   In the spring of 2009, Shah appeared at the City's golf course and distributed business cards to golf course patrons bearing the mark "THE CROSSINGS AT CARLSBAD" and the Logo, and identifying himself as the President and CEO "The Crossings at Carlsbad, a California Corporation." (SF No. 48.)

47.   Shah has stated that if this action is resolved in his favor, he intends to sell golf apparel and merchandise bearing the marks "THE CROSSINGS AT CARLSBAD," "TCAC," the Logo and the Marbrisa Logo in the future.  (SF No. 49.)

48.   In December 2009, Shah's website, www.thecrossingatcarlsbad.com, displayed the Marks and the Logo and stated, among other things, "THE CROSSINGS AT CARLSBAD OWNED BY PRINCE REZA IS A FEDERALLY REGISTERED TRADEMARK OF THE CROSSINGS AT CARLSBAD GOLF COURSE CORPORATION." (SF No. 50.)

49.   In December 2009, Shah's website www.carlsbad.mobi stated, among other things, "all rights reserved prince reza" and "all other marks contained herein are trademarks of prince reza intellectual property and-or prince reza corporations companies" (sic). (SF No. 51.)

## V.   FACTS DETERMINED UPON SUMMARY JUDGMENT

50.   The following facts were established as a result of the Court's Order (1) Granting Plaintiff's Motion for Partial Summary Judgment, (2) Declaring Plaintiff as the Rightful Owner of the Trademarks and Logo at Issue, and (3) Authorizing the USPTO to Deny Defendant's Applications and Register Plaintiff's Applications ("MSJ Order dated October 20, 2009, Doc. No. 26 ):

51.   Plaintiff is the owner of the trademark "THE CROSSINGS AT CARLSBAD."  (MSJ Order, p. 12.)

52.   Plaintiff is the owner of the trademark "TCAC" (together with "THE CROSSINGS AT CARLSBAD," the "Marks"). (*Id.*)

53.   Plaintiff is the owner of the trademark "The Crossings at Carlsbad" logo (the "Logo").  (MSJ Order, p. 12.)

54.   Plaintiff's use of the Marks in commerce began no later than January or February of 2007.  (MSJ Order,  Doc. No. 26, at p. 11.)

08cv1211

55.    Defendant has not produced any objective evidence supporting his contention that he had a bona fide intent to use the marks that are the subject of his trademark applications.

56.    The Court has authorized the USPTO to grant Plaintiff's trademark applications.

57.    The Court has authorized the USPTO to deny Defendant's trademark applications.

## *CONCLUSIONS OF LAW*

### *I.     The City's Claims of Copyright Infringement*

#### *A. Judicial Notice of the Copyright Registration*

58.    A copyright registration certificate provides prima facie evidence of the validity of the copyright, such that the holder of the registration certificate need not put on evidence of ownership or originality in the copyrighted work. *See* 17 U.S.C. § 410(c)); *Educ. Testing Serv. v. Simon*, 95 F.Supp.2d 1081, 1087 (C.D. Cal.1999); *Lamps Plus, Inc. v. Seattle Lighting Fixture Co.*, 345 F.3d 1140, 1144-45 (9th Cir. 2003).  Rather, the burden is on the defendant to overcome the presumption of validity. *Bibbero Systems, Inc. v. Colwell Systems, Inc.*, 893 F.2d 1104, 1106 (9th Cir. 1990).

#### *B. The City's Copyright Infringement Claim*

59.    To prevail on a copyright infringement claim, a Plaintiff must demonstrate: (1) ownership of a valid copyright, and (2) copying of original elements of the work.  *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991).

60.    The City's has established ownership of a valid copyright in the Logo. The City secured the exclusive rights and privileges to the copyright by registering the same with the United States Copyright Office.[2] The effective date of the City's copyright registration for the Logo is March 31, 2008. The Logo itself was formally adopted by the City Council on March 1, 2007, and the City began using it shortly thereafter.

61.    The Court notes that Shah does not contest Plaintiff's claim of copyright infringement and the second element, copying, is demonstrated here by Shah's own admission that his "Marbrisa" logo was copied from the Logo being used for the City's golf course. (SF 41 and 42.)

62.    Even absent these admissions, copying is established on proof that: (a) the defendant had access to the allegedly infringed work; and (b) the two works (i.e., the original and the alleged copy) are

---

[2] The Court takes judicial notice of the Plaintiff's Copyright Registration.

substantially similar.  *See Narrell v. Freeman*, 872 F.2d 907, 910 (9th Cir. 1990).  Here, stipulated facts and the facts proven at trial, as discussed above, make it clear that Shah had the requisite access to the City's Marks and Logo and the copied works are substantially similar.  Shah used an exact replica of the City's Logo on his business cards.  Shah has admitted, and it is obvious from the side-by-side comparison, that Shah's Marbrisa logo and the City's Logo are identical in all respects except for the replacement of the word "Carlsbad" with the word "Marbrisa." Additionally, the most creative portions of the City's copyright registered Logo are the wave pattern and the arched design of the words "The Crossings."  Both of those creative elements (in addition to the type font used) are identical in the City's copyright registered Logo and in Shah's The Crossings at Marbrisa logo.  As such, the Court finds that the Defendant has infringed the Plaintiff's copyright.

### C.  Statutory Damages

63.    The City has elected to recover statutory damages under Section 504 of the Copyright Act.[3] Under 17 U.S.C. § 504(a) and (c), a copyright owner may elect to recover statutory damages instead of actual damages and any additional profits.

64.    Title 17 U.S.C. § 412(2) provides that no award of statutory damages or of attorney's fees, as provided by sections 504 and 505, shall be made for any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work.

---

[3] Under Section 504 of the Copyright Act, a copyright owner may elect statutory damages at any time before final judgment is rendered. 17 U.S.C. § 504(c)(1).  The amount of statutory damages with respect to any one work is "a sum of not less than $750 or more than $30,000 as the court considers just." 17 U.S.C. § 504(c)(1).  Where the court finds that a defendant committed willful infringement, "the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000."  17 U.S.C. § 504(c)(2).
    The amount of statutory damages applies to each act of infringement occurring after registration. 17 U.S.C. § 412; *Harris v. Emus Records Corp.*, 734 F.2d 1329, 1335 (9th Cir. 1984).  A significant purpose of statutory damages is the discouragement of future infringements; therefore, the award need not reflect actual damages. *F. W. Woolworth Co. v. Contemporary Arts, Inc.*, 344 U.S. 228, 233 (1952).  "Even for uninjurious and unprofitable invasions of copyright the court may, if it deems it just, impose a liability within [the] statutory limits to sanction and vindicate the statutory policy of discouraging infringement." *Peer Int'l Corp. v. Pausa Records, Inc.*, 909 F.2d 1332, 1336-37 (9th Cir. 1990) (affirming award of maximum damages, then $50,000, despite defendants' argument that statutory damages provisions, "should not be converted into a windfall" and plaintiff had suffered "only nominal damages"); *see also Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 886 F.2d 1545, 1554-155 (9th Cir. 1989).

08cv1211

65.     The effective date of the City's copyright registration for the Logo is March 31, 2008. The Logo was adopted by the City Council on March 1, 2007, and the City began using the Logo in March and April 2007.

66.     Section 412(2) leaves no room for discretion and clearly mandates that, in order to recover statutory damages, the copyrighted work must have been registered prior to commencement of the infringement, unless the registration is made within three months after first publication of the work. *See id.* (precluding an award of attorneys' fees as well); *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 707 n. 5 (9th Cir. 2004). Since the City's registration was not made within three months after the first publication of the work, § 412(2) precludes the award of statutory damages and attorney's fees for Shah's infringing activities that occurred prior to March 31, 2008, the effective date of the City's copyright registration.

67.     The City contends that there were four separate and distinct acts of infringement by Shah after the City obtained its Copyright Registration for the Logo on March 31, 2008.  The City argues that Shah infringed the City's copyright in at least four new and different ways after the effective date of the City's copyright registration, including (1) Shah's Facebook page which was created in 2010 or 2011 (TE 68); (2) Shah's business card for "The Crossings at Dubai" (TE 22); (3) Shah's use of a derivation of the Logo (including use of a golf ball in place of the "O" in Crossings on letterhead appearing on Shah's website http://princereza.com on September 25, 2008 (TE 24); and (4) Shah's display on one or more websites of versions of the City's Logo that contain the wave pattern and the words "The Crossings at Carlsbad," and which now includes a golf flag and hole, and a curved green line to signify a putting green. (TE 16, 18, 19, 64 and 65.)

68.     The first act of infringement in a series of ongoing infringements of the same kind marks the commencement of one continuing infringement under § 412. This interpretation, set forth by the Ninth Circuit, furthers Congress' intent to promote the early registration of copyrights.[4] Given the Ninth

---

[4] *See Bouchat v. Bon-Ton Dep't Stores, Inc.*, 506 F.3d 315, 330 (4th Cir. 2007), *cert. denied*, ---U.S. ----, 128 S.Ct. 2054, 170 L.Ed.2d 810 (2008); *Troll Co. v. Uneeda Doll Co.*, 483 F.3d 150, 158 (2d Cir.2007); *Johnson*, 149 F.3d at 506; *Mason v. Montgomery Data, Inc.*, 967 F.2d 135, 142-44 (5th Cir.1992).

08cv1211

Circuit's interpretation of § 412, this Court must determine whether Shah's post-registration infringements were an ongoing continuation of its initial pre-registration infringement.

69.     In interpreting Section 412 and specifically the meaning of the pertinent phrase "any infringement of copyright commenced," nearly every court that has considered the question has found "that infringement commences for the purposes of § 412 when the first act in a series of acts constituting continuing infringement occurs."[5]  These courts have found that the statutory intent of 17 U.S.C. § 412 was to impose an obligation on Plaintiff(s) to copyright their work in a timely manner and found that inclusion of the word "commenced" in Section 412 to be indicative of Congress's desire to cover activity that commences at one time and continues or recurs thereafter.[6]

70.     As set forth above, Shah began his infringing activity before the effective registration date, and repeated the same infringing activity after that date each time using the copyrighted material. Shah began his infringing activity in November of 2006 by: (1) registering numerous domain names in 2006 (SF 33), (2) filing numerous trademark applications in 2006 and 2007 (SF 39); (3) numerous instances of copying the logo and creating derivative works in 2006 and 2007 (SF 42 and 43); (4) forming California Corporations under these names in 2007 (SF 46); (5) distributing business cards to golf course patrons bearing the mark "THE CROSSINGS AT CARLSBAD" and the Logo, and identifying himself as the President and CEO "The Crossings at Carlsbad, a California Corporation" in 2009 (SF 48); (6) in December 2009, Shah's website  www.thecrossingatcarlsbad.com, displayed the Marks and the Logo (SF 50 and 51); (7) Shah's continuous use of the Logo and derivatives on web sites starting in or about 2007 and continuing to present (including use of a golf ball in place of the "O" in Crossings on letterhead appearing on Shah's website http://princereza.com on September 25, 2008) (TE 16, 18, 19, 24,

---

[5] *Johnson v. Jones*, 149 F.3d 494, 506 (6th Cir.1998) (citing *Ez-Tix, Inc. v. Hit-Tix, Inc.*, 919 F.Supp. 728, 736 (S.D.N.Y.1996); *Parfums Givenchy, Inc. v. C & C Beauty Sales, Inc.*, 832 F.Supp. 1378, 1393 (C.D.Cal.1993); *Mason v. Montgomery Data, Inc.*, 741 F.Supp. 1282, 1286 (S.D.Tex.1990), rev'd on other grounds, 967 F.2d 135 (5th Cir.1992); *Singh v. Famous Overseas, Inc.*, 680 F.Supp. 533, 536 (E.D.N.Y.1988); *Johnson v. University of Virginia*, 606 F.Supp. 321, 325 (D.Va.1985); and *Whelan Assocs. v. Jaslow Dental Lab, Inc.*, 609 F.Supp. 1325 (E.D.Pa.1985)).

[6] *Parfums Givenchy*, 832 F.Supp. at 1394; *See also Singh*, 680 F.Supp. at 536 (reasoning that Congress, deeming registration useful and important, sought some practical means of inducing it and therefore chose to deny the "extraordinary" remedies of statutory damages and attorney's fees where registration is not promptly made.)

64 and 65); (8) Copied the Logo verbatim and placed the Logo on business cards and letterhead that identified him as the founder and CEO of the Crossings at Carlsbad (TE 20-22); and (9) continuing to post the Logo and derivations of the Logo on his web sites well into 2011, and (10) using the Logo on t-shirts and hats that have been produced but not sold (TE 54 40:20-42:7; TE 55 101:19-21).

71.     Shah began infringing the City's copyright in 2006, and continued his infringing activity by repeatedly copying and using the Logo on various web sites, business cards, letterheads and t-shirts and hats.  All of these alleged infringements arose out of Shah's initial infringement and any post-registration conduct is therefore traceable to Shah's pre-registration conduct. As such, the pre-registration infringement and the post-registration infringement constitute one continuing infringement for purposes of § 412(2). Contrary to the City's arguments, there is no legally significant difference between the pre-registration conduct and the post-registration conduct that would suggest that the alleged infringement was anything but an ongoing series of infringements that commenced in 2006. *See Derek Andrew*, 528 F.3d at 701 (determining that § 412 barred recovery of statutory damages where defendant engaged in an ongoing series of infringement by the same act that began prior to registration); *see also Morgan v. Hawthorne Homes, Inc*., Slip Copy, 2011 WL 2181385 W.D.Pa.,2011. Each act of infringement stems from the initial acquisition and copying of City's Logo by Shah. As such, any incidences of post-registration infringement were ongoing acts that "commenced" prior to registration and therefore § 412(2) prevents recovery of statutory damages and attorney's fees in that regard.  The City's requests for statutory damages and attorney's fees for copyright infringement are hereby DENIED.

## II.     *The City's Anticybersquatting Consumer Protection Act ("ACPA") Claims*

72.     The Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S .C. § 1125(d), was enacted in 1999 to protect consumers and  to prevent misappropriation of trademarks by stopping conduct known as "cybersquatting." *See* ACPA, Pub.L. No. 106–113, 113 Stat. 1501 (1999) (codified at 15

1   U.S.C. § 1125(d)); *Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc.*, 202 F.3d 489, 493 (2d Cir.2000). The

2   ACPA protects both federally-registered marks as well as unregistered marks.[7]

3   73.   In the ACPA, Congress added section 43(d)[8] to the Lanham Act and defined cybersquatting as

4   registering or using with a bad faith intent to profit a domain name that is confusingly similar to a

5   registered or unregistered mark or dilutive of a famous mark. *See* 15 U.S.C. § 1125(d); 4 McCarthy §

6   25:78.

7   74.   Liability under the ACPA[9] is established if the Defendant used a domain name in which the

8   Plaintiff has trademark rights and did so in bad faith. *Interstellar Starship Services, Ltd. v. Epix, Inc.*,

9   304 F.3d 936, 946 (9th Cir. 2002). Even if a domain name is initially registered[10] in good faith, a

10  defendant is still liable for cybersquatting if there is subsequent bad faith use with intent to profit. *DSPT*

11  *Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1220 (9th Cir. 2010) ("Evidence of bad faith may arise well after

12  registration of the domain name.")

13  75.   To successfully assert a claim under the ACPA, a plaintiff must demonstrate that (1) its marks

14  were distinctive at the time the domain name was registered; (2) the infringing domain names

15

16

17      [7] *DaimlerChrysler v. The Net Inc.*, 388 F.3d 201, 205 (6th Cir.2004) (citing *Two Pesos Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992)); see also 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 25:78 (4th ed. 2007) (hereinafter "McCarthy").

18

19      [8] Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), creates a private claim for injunctive

20  relief and damages against any person who in connection with goods "uses in commerce any word, term, name, symbol or device" or "any false designation of origin, false or misleading description" or "representation of fact" which is "likely to cause confusion" or "to deceive" as to "the origin" of the

21  goods. This provision protects an unregistered trademark and trade dress against infringement. *See Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 168 (2d Cir.1991).

22

23      [9] The Anticybersquatting Consumer Protection Act ("ACPA") provides in pertinent part:
        A person shall be liable in a civil action by the owner of a mark . . . if, without

24  regard to the goods or services of the parties, that person-
        (i) has bad faith intent to profit from that mark . . . ; and

25      (ii) registers, traffics in, or uses a domain name that—
            (I) in the case of a mark that is distinctive at the time of registration of the
            domain name, is identical or confusingly similar to that mark;

26  15 U.S.C. § 1125(d)(1)(A).

27

28      [10] Looking at ACPA in light of traditional property law, however, it appears that Congress meant "registration" to refer only to the initial registration and not re-registration. *GoPets Ltd. v. Hise*, 657 F.3d 1024, 1031 (9th Cir. 2011).

08cv1211

1 complained of are identical to or confusingly similar to plaintiff's mark; and (3) the infringer has a bad

2 faith intent to profit from that mark. See 15 U.S.C. § 1125(d)(1)(a).

3 ///

4 ///

5 ///

6       **A. The City's Marks Were Distinctive at the Time the Domain Names Were Registered**

7 76.    There are five categories of trademarks: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary;

8 and (5) fanciful.[11]  The Ninth Circuit has held that marks which are not merely descriptive of the goods

9 or services sold under the mark are "distinctive" for purposes of the ACPA.

10           We have said that the 'primary criterion' for distinguishing between a

11           suggestive and a descriptive mark 'is the imaginativeness involved in the
          suggestion, that is, how immediate and direct is the thought process from

12           the mark to the particular product…. A mark is suggestive if 'imagination'
          or a 'mental leap' is required in order to reach a conclusion as to the nature

13           of the product being referenced.' … By contrast, a mark is descriptive if it
          'define[s] a particular characteristic of a product in a way that does not

14           require any exercise of the imagination.

15 *Lahoti*, 586 F.3d at 1198.

16 77.    The primary criteria for distinguishing between a suggestive and a descriptive mark is the

17 imaginativeness involved in the suggestion, that is, how immediate and direct is the thought process

18 from the mark to the particular product.  *Lahoti*, 586 F.3d at 1198 (quoting *Self–Realization Fellowship*

19 *Church v. Ananda Church of Self–Realization*, 59 F.3d 902, 911 (9th Cir.1995)). "A mark is suggestive

20 'if imagination or a mental leap is required in order to reach a conclusion as to the nature of the product

21 being referenced.' " *Id.* (quoting *Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc.*, 198 F.3d

22 1143, 1147 n. 3 (9th Cir.1999)).

23 78.    "Placement on the spectrum of distinctiveness does not end the inquiry as to the strength of a

24 mark: it is only the first step. The second step is to determine the strength of this mark in the

25

26      [11] *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 927 (9th
Cir.2005). Word marks that are " 'arbitrary' ('Camel' cigarettes), 'fanciful' ('Kodak' film), or

27 'suggestive' ('Tide' laundry detergent)" are inherently distinctive. *Wal–Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210–11, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000); Lahoti, 586 F.3d at 1197.

28 These three categories are entitled to trademark protection because they "serve[ ] to identify a particular
source of a product...." *Two Pesos*, 505 U.S. at 768, 112 S.Ct. 2753.

marketplace. That is, to ascertain its degree of recognition in the minds of the relevant customer class." 2 McCarthy § 11.2.

79.     The distinctiveness of a mark must be assessed not in the abstract, but in relation to the applicable goods or services, the context in which the mark is used and encountered in the marketplace, and the significance the mark in that context is likely to have to the average consumer. *Lahoti*, 586 F.3d at 1201. As the Ninth Circuit teaches, "Context is critical to a distinctiveness analysis." *Id.*

80.     The Court finds that the City's Marks, "The Crossings at Carlsbad" and "TCAC" which were used in commerce in March or April of 2007 in connection with the City's golf course, are distinctive and that the Marks were distinctive at the time Shah registered the domain names in November and December 2006.

81.     The Court's finding of distinctiveness for these Marks is based on the following facts establishing that the Marks are distinctive: 1) the USPTO has registered the Marks on the Principal Register; therefore, the Marks are presumptively distinctive; and 2) the Marks are not merely descriptive and do not merely describe the products or services being offered by the City under those Marks; rather, the Marks are suggestive, as imagination is required in order to reach a conclusion that the "Crossings at Carlsbad" and "TCAC" reference the City's golf course and golf-related goods and services.

### B. The Infringing Domain Names Are Identical to or Confusingly Similar to Plaintiff's Marks

82.     The domain names registered by Shah are either identical or confusingly similar to the City's Marks.  In total, Shah registered 20 domain names that are identical or confusingly similar to the City's Marks.[12] (SF No. 35.)

---

[12] Domain Names Registered by Shah:

| Domain Name | Date of Registration |
|---|---|
| (1)  www.thecrossingatcarlsbad.com, | 11/21/2006 |
| (2)  www.thecrossingsatcarlsbad.mobi, | 11/22/2006 |
| (3)  www.thecrossingatcarlsbad.net, | 11/21/2006 and again on 02/14/09 |
| (4)  www.thecrossingsatcarlsbadinc.mobi, | 12/14/2006 |
| (5)  www.golfthecrossingatcarlsbad.com, | 11/29/2006 |
| (6)  www.golfthecrossingatcarlsbad.mobi, | 11/29/2006 |
| (7)  www.golfthecrossingatcarlsbad.net, | 11/29/2006 |
| (8)  www.golfthecrossingsatcarlsbad.com, | 11/21/2006 |
| (9)  www.golfthecrossingsatcarlsbad.mobi, | 11/22/2006 |
| (10)  www.golfthecrossingsatcarlsbad.net, | 11/21/2006 |
| (11)  www.tcac.mobi, | 11/22/2006 |
| (12)  www.tcacgolf.com, | 11/26/2006 |

### C. Bad Faith Intent to Profit from the Use of the Marks

83.    Congress has enumerated nine nonexclusive factors for the courts to consider in determining whether bad faith exists.[13] *See* 15 U.S.C. § 1125(d)(1)(B)(I).  The Court, however, need not "march through the nine factors seriatim because the ACPA itself notes that the use of the listed criteria is permissive." *Lahoti*, 586 F.3d at 1203. Rather, the Court must look at the individual circumstances of the case, including whether the infringing activity was willful. *Id.*

84.    In determining bad faith intent, "[w]illfulness can be inferred by the fact that a defendant continued infringing behavior after being given notice" of the allegations of infringement. *Louis Vuitoon Malletier and Oakley, Inc. v. Veit*, 211 F.Supp.2d 567, 583 (E.D. Pa. 2002). Additionally, the courts

| | | |
|---|---|---|
| (13) | www.tcacgolf.mobi, | |
| (14) | www.tcacgolf.net | 11/26/2006 |
| (15) | www.golftcac.mobi | 11/27/2006 |
| (16) | www.crossingsatcarlsbad.com | 11/28/2006 and again on 2/23/09 |
| (17) | www.crossingsatcarlsbad.net | 11/28/2006 and again on 2/19/09 |
| (18) | www.crossingatcarlsbad.com | 11/29/2006 |
| (19) | www.crossingsatcarlsbad.mobi | 11/29/2006 and again on 2/15/09 |
| (20) | www.thecrossingatcarlsbad.mobi | 11/29/2006 and again on 2/14/09 |

[13] Congress has enumerated nine nonexclusive factors for the courts to consider in determining whether bad faith exists. See 15 U.S.C. § 1125(d)(1)(B)(I):
(I) the trademark or other intellectual property rights of the person, if any, in the domain name;
(II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;
(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;
(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;
(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;
(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and
(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section."

1  consider the egregiousness of the defendant's cybersquatting and other behavior evidencing an attitude of

2  contempt. *Verizon California, Inc. v. Onlinenic, Inc.*, 2009 WL 2706393 *3-6 (N.D. Ca. 2009).

3  85.    When determining bad faith, courts may also consider the defendant's registration or acquisition

4  of multiple domain names which the defendant knows are identical or confusingly similar to distinctive

5  marks of others. *Id.* at 1202-1203 (citing 15 U.S.C. § 1125(d)(1)(B)(i)(VIII) (finding bad faith on the part

6  of the defendant and holding that it was undisputed that defendant was a repeat cybersquatter who had

7  registered hundreds of domain names resembling distinctive or famous trademarks.)

8  86.    Although Shah has not admitted his bad faith and intent to profit, the stipulated and undisputed

9  facts lead inexorably to that conclusion. The stipulated and undisputed facts include the following:

10 • In October and November 2006, Shah registered more than 400 domain names, many
   of which include the names of popular individuals, corporations, and brands. (SF 37-38.) Shah
11 was not conducting any business per se using these domain names, but rather was warehousing
   them, and had an established pattern of warehousing domain names consisting of various identical
12 or similar combinations of the marks of others.

13 • Prior to registering the 20 domain names at issue in this case, Shah was aware that the
   domain name thecrossingsatcarlsbad.com had already been registered by someone else. (SF 36.)
14
15 • Shah began registering domain names like thecrossingsatcarlsbad.com on November
   21, 2006, the same day the City Council formally adopted The Crossings at Carlsbad as the name
   for the City's golf course. (SF 10-11, 35, Ex. B.)
16
17 • As the Court previously found, Shah lacked any bona fide intent to use the marks
   when he filed his now-rejected trademark applications. (Doc. No. 26.)

18 • After the City initiated this action in July 2008, Shah disregarded the City's claims of
   infringement and re-registered the following domain names in February 2009:
19 www.crossingsatcarlsbad.com; www.crossingsatcarlsbad.net; www.crossingatcarlsbad.com;
   www.crossingsatcarlsbad.mobi; and www.thecrossingatcarlsbad.mobi. (SF No. 35, Ex. B.)
20
21 • Shah has continued to use domain names which are substantially similar to the City's
   Marks well after the City's initiation of this lawsuit and well after this Court's October 20, 2009
22 order established the City's ownership of the Marks and Logo. (SF 50-51.)

23 • Furthermore, even though the Court has ruled that the City is the owner the Marks, Shah
   has continued to claim ownership of them in defiance of the Court's order. (SF 50-51.)

24 87.    Shah did not have reasonable grounds for believing that his use of the City's Marks in the 20

25 domain names he registered was fair use or otherwise lawful.  He has presented no evidence to support

26 such a finding.  Prior to registering the 20 or more domain names, Shah knew the City had named its golf

27 course "The Crossings at Carlsbad" and had registered its own domain names, which belies any claim of

28 good faith.

88.     ACPA contains a safe harbor defense for registrants who "believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii). However, the Ninth Circuit has cautioned that the safe harbor defense should be invoked "very sparingly and only in the most unusual cases." *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1203 (9th Cir.2009). A defendant "who acts even partially in bad faith" cannot successfully assert a safe harbor defense. *Id.* (internal quotation marks omitted).

89.     The Court finds that based upon the foregoing, Shah is not entitled to protection under the ACPA's safe harbor provision because there was no reasonable basis for his alleged belief that his use of the domain names was lawful.  Shah's actions throughout the course of this litigation contradict any claim of good faith. "A defendant who acts even partially in bad faith in registering a domain name is not, as a matter of law, entitled to the benefit from the [ACPA's] safe harbor provision." *Lahoti v. Vericheck, Inc.*, 586 F.3d 1190, 1203 (9th Cir. 2009) (citing *Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264, 270 (4th Cir. 2001);*DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1220 (9th Cir. 2010) (finding that even if a domain name is initially registered in good faith, a defendant is still liable for cybersquatting if there is subsequent bad faith use with intent to profit.)

90.     Based upon the foregoing, the Court finds Shah's registration of 20 domain names that are identical or confusingly similar to the City's marks "The Crossings at Carlsbad" and/or "TCAC" to be in violation of the ACPA, because the Marks at issue are distinctive for purposes of the ACPA and Shah acted in bad faith.

### D. Statutory Damages Under the ACPA

91.     Under the ACPA, the City may elect as its measure of damages statutory damages in the amount of not less than $1,000 and not more than $100,000 per domain name, as the court considers just. 15 U.S.C. § 1117(d). In general, when a plaintiff seeks statutory damages, "the court has wide discretion in determining the amount of statutory damages to be awarded, constrained only by the specified maxima and minima." *Columbia Pictures Television, Inc. v. Krypton Broad. Of Birmingham, Inc.*, 259 F.3d 1186, 1194 (9th Cir. 2001); *see also Harry and David v. Pathak*, 2010 WL 4955780, *5 (D.Or. 2010). The policy behind Section 1117 damages is to "take all economic incentive out of trademark infringement." *Intel Corp. v. Terabyte Int'l, Inc.*, 6 F.3d 614, 621 (9th Cir. 1993) (internal citation omitted).

08cv1211

92.     The City requests $500,000 in statutory damages for its ACPA claims; which includes the maximum $100,000 for each of the four domain names that was registered by Shah in February 2009 and $100,000 for all of the other domain names combined.

93.     In light of Shah's continued use of at least two domain names which incorporate or closely resemble the Marks after the Court's October 20, 2009, summary judgment ruling, (Doc. No. 26, SF 50 and 51), the Court finds that Statutory damages under the ACPA are warranted.

### E. The City's Request for Attorneys' Fees Under the ACPA

94.     An award of reasonable attorneys' fees and costs is expressly provided for in "exceptional cases" of trademark infringement.[14] "While the term 'exceptional' is not defined in the statute, attorneys' fees are available in infringement cases where the acts of infringement can be characterized as malicious, fraudulent, deliberate, or willful."[15] This definition refers to the nature of the defendant's infringement in a case where the plaintiff prevails.

95.     The Ninth Circuit construes the "exceptional circumstances" requirement narrowly. *Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 990 (9th Cir. 2008).  "Exceptional circumstances can be found when the non-prevailing party's case is groundless, unreasonable, vexatious, or pursued in bad faith." *Id.*; *see also Horphag Research Ltd. v. Pellegrini*, 337 F.3d 1036, 1040 (9th Cir.2003); *Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1156 (9th Cir. 2002).

96.     The Court finds that Shah's infringement was malicious, fraudulent, deliberate and willful. Shah knowingly, intentionally and deliberately adopted and used the City's Marks in order to cause confusion. Shah has persisted in using the City's Logo in connection with his business enterprise even after the summary judgment ruling that established the City's rights in the Marks and the Logo. Shah has no good faith basis for refuting the City's ownership of the Marks and Logo, and his arguments and behavior throughout this case have been groundless, unreasonable, vexatious, and pursued in bad faith.

---

[14] *Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 990 (9th Cir. 2008) (finding a district court has discretion to award attorneys' fees to a prevailing party under the Lanham Act, but only in "exceptional cases." *See* 15 U.S.C. § 1117(a) ("The court in exceptional cases may award reasonable attorney fees to the prevailing party."); *Gracie v. Gracie*, 217 F.3d 1060, 1071 (9th Cir.2000).

[15] *Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1023 (9th Cir.2002); *Lindy Pen Co., Inc. v. Bic Pen Corp.*, 982 F.2d 1400, 1408 (9th Cir.1993); *see also Committee for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 825 (9th Cir.1996).

97.     Based upon the facts as set forth above, it is clear that Shah acted with a conscious disregard of the City's intellectual property rights and with a malicious intent to profit from the City's works. As such, this Court finds exceptional circumstances exist in this case warranting the award of attorney fees for the City's successful ACPA claims.

98.     The Lanham Act provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party," but does not address the proper procedure for determining reasonable attorney fees in a case involving non-Lanham Act claims and unsuccessful Lanham Act claims, in addition to successful claims under the Act. *See* 15 U.S.C. § 1117(a). The question of whether the correct determination of attorneys' fees in such cases requires allocation or apportionment between Lanham Act and non-Lanham Act claims has been addressed by other courts.[16]

99.     As a general matter, the prevailing party in a case involving Lanham Act and non-Lanham Act claims can recover attorneys' fees only for work related to the Lanham Act claims and cannot recover legal fees incurred in litigating non-Lanham Act claims unless "the Lanham Act claims and non-Lanham Act claims are so intertwined that it is impossible to differentiate between work done on claims."[17]

100.    Thus, despite the general rule of apportionment, in a specific case apportionment might not be required if "it is impossible to differentiate between work done on claims." *Gracie v. Gracie*, 217 F.3d 1060, 1070-71 (9th Cir. 2000). The impossibility of exact apportionment does not relieve the district court of its duty to make some attempt to adjust the fee award in an effort to reflect an apportionment. In other words, apportionment or an attempt at apportionment is required unless the court finds the claims are so inextricably intertwined that even an estimated adjustment would be meaningless.

---

[16] The Sixth Circuit has held that "under 15 U.S.C. § 1117(a), attorneys' fees are recoverable only for work performed in connection with claims filed under the Lanham Act." *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1193 (6th Cir.1997). *In Neva, Inc. v. Christian Duplications Int'l, Inc.*, 743 F.Supp. 1533, 1543 (M.D.Fla.1990), a district court held that Lanham Act plaintiffs are "only entitled to attorney fees for legal expenses incurred in prosecuting the claim arising under the Lanham Act."

[17] John W. Crittenden & Eugene M. Pak, Monetary Relief Under Lanham Act Section 35, in Litigating Copyright, Trademark & Unfair Competition Cases for the Experienced Practitioner 1998, at 419 (PLI Pat., Copyrights, Trademarks and Literary Property Course Handbook Series No. 537, 1998) (surveying district court cases, including Neva ) (emphasis added); *see also* Robin C. Larner, Award of attorneys' fees under § 35(A) of Lanham Act, 82 A.L.R. Fed. 143, 198 (1987) (comparing two district court decisions, one allowing recovery of legal fees incurred on state law claims related to Lanham Act claims and one denying recovery of such legal fees).

08cv1211

101.    The City's request for attorney fees under the ACPA is GRANTED. In light of the apportionment requirements set forth above, the City's declaration in support of its request for attorney's fee should set forth only those attorneys fees incurred for the ACPA claims.

**III.    *The City's State and Federal Claims of Unfair Competition***

　　　　*A. The City's Claims of Unfair Competition Under California Law*

102.    California provides both statutory and common law causes of action for unfair competition. The statutory cause of action is governed by Cal.Bus. & Prof.Code § 17200, et seq., whereas the common law cause of action is discussed in *Bank of the West v. Superior Court*, 2 Cal.4th 1254, 1263–65, 833 P.2d 545, 550–52, 10 Cal.Rptr.2d 538, 543–45 (1992) (en banc).

　　　　　　　*1. Statutory Unfair Competition*

103.    To state a claim for unfair competition pursuant to California Business and Professions Code § 17200 (Section 17200), a "plaintiff must establish that the practice is either unlawful (i.e., is forbidden by law), unfair (i.e., harm to victim outweighs any benefit) or fraudulent (i.e., is likely to deceive members of the public)." *Albillo v. Intermodal Container Services, Inc.*, 114 Cal.App.4th 190, 206, 8 Cal.Rptr.3d 350 (2003). Because the law is stated in the disjunctive, it contemplates three distinct categories of unfair competition and a plaintiff must plead the specific rubric under which the proscribed conduct falls. *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal.4th 163, 180, 83 Cal.Rptr.2d 548, 973 P.2d 527 (Cal.1999).

104.    Where the plaintiff brings a claim based on the unlawful prong, the plaintiff must identify the particular section of the statute that was allegedly violated, and must describe with reasonable particularity the facts supporting the violation. *See Brothers v. Hewlett-Packard Co.*, 2006 WL 3093685, *7 (N.D.Cal. Oct.31, 2006) (citing *Khoury v. Maly's of California, Inc.*, 14 Cal.App.4th 612, 619, 17 Cal.Rptr.2d 708 (1993)).

　　　　　　*2. Common Law Unfair Competition*

105.    The common law tort of unfair competition is generally thought to be synonymous with the act of "passing off" one's goods as those of another. The tort developed as an equitable remedy against the wrongful exploitation of trade names and common law trademarks that were not otherwise entitled to legal protection. (*See generally* 1 Callmann, Unfair Competition, Trademarks & Monopolies (4th ed.

08cv1211

1   1981) §§ 2.01-2.03.) According to some authorities, the tort also includes acts analogous to "passing

2   off," such as the sale of confusingly similar products, by which a person exploits a competitor's

3   reputation in the market. (*See* Rest., Torts, §§ 711-743; *see also* 1 Callmann, § 2.04.)

4   106.    California's unfair competition law ("UCL") prohibits any "unlawful, unfair or fraudulent

5   business practice." Cal. Bus. & Prof. §§ 17200 et seq. The "unlawful" prong of the UCL proscribes

6   "anything that can properly be called a business practice and that at the same time is forbidden by law."

7   *Smith v. State Farm Mut. Auto. Ins. Co.*, 93 Cal.App.4th 700, 717-718, 113 Cal.Rptr.2d 399 (2001)

8   (internal quotations omitted). The UCL "borrows" these "violations of other laws and treats them as

9   'unlawful' practices independently actionable under the unfair competition law." *Id.* at 718, 113

10  Cal.Rptr.2d 399.  *See Stop Youth Addiction v. Lucky Stores, Inc.*, 950 P.2d 1086, 1091 (Cal. 1998);

11  *Farmers Ins. Exch. v. Superior Court*, 826 P.2d 730, 734 (Cal. 1992).  Fraudulent practices are those that

12  are likely to deceive members of the public. *Comm. On Children's Television, Inc. v. Gen Foods Corp.*,

13  673 P.2d 660, 668 (Cal. 1983).

14  107.    Common law unfair competition "is normally invoked in an effort to protect something of value

15  not otherwise covered by patent or copyright law, trade secret law, breach of confidential relationship, or

16  some other form of unfair competition." *City Solutions v. Clear Channel Commc'ns., Inc.*, 365 F.3d 835,

17  842 (9th Cir. 2004) (internal quotations omitted).

18  108.    In California, this tort has four elements: (1) the plaintiff invested substantial time, skill, or

19  money in developing its property; (2) the defendant appropriated and used the property at little or no

20  cost; (3) the plaintiff did not authorize or consent to the property's appropriation and use; and (4) the

21  plaintiff was injured by the appropriation and use. *Id.*

22  109.    Common law unfair competition is considered either synonymous with "passing off" one's goods

23  as those of another, or analogous to passing off, by selling products confusingly similar to a competitor's

24  products so as to exploit the competitor's reputation in the market. *Southland Sod Farms*, 108 F.3d at

25  1134, 1147 (9th Cir. 1997). "Passing off" violates both common law unfair competition and unfair

26  competition under the Lanham Act. *Smith*, 648 F.2d at 604.

27  109.    State common law claims of unfair competition are "substantially congruent" to claims made

28  under the Lanham Act. *Cleary v. News Corp.*, 30 F.3d 1255, 1262-63 (9th Cir. 1994) (citing *Academy of*

1   *Motion Picture Arts & Sciences v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1457 (9th Cir.

2   1991).  Under common law unfair competition claims, the "ultimate test" is "whether the public is likely

3   to be deceived or confused by the similarity of the marks."  *Century 21 Real Estate Corp. v. Sandlin*, 846

4   F.2d 1175, 1178 (9th Cir. 1988).

5   110.     As set forth above, Shah registered infringing domain names, incorporated California

6   corporations with infringing names, purchased Yellow Pages directory listings using the name "The

7   Crossings at Carlsbad Golf Course," and has identified himself to patrons of the City's golf course as the

8   President and CEO of The Crossings at Carlsbad, a California Corporation.  Each of these acts constitute

9   unfair competition and false designation of origin in violation of Section 43(a) of the Lanham Act, 15

10  U.S.C. § 1125(a).  Shah's actions and use of the Marks and Logo suggest a false designation of origin, are

11  likely to cause confusion, and are likely to deceive as to the affiliation, connection, or association of Shah

12  with the City and its golf course.  Shah's use of the Marks and Logo are also likely to deceive as to the

13  origin, sponsorship, or approval of Shah's goods, services, or commercial activities by the City and its

14  golf course.

15  111.     Based upon the foregoing, the Court finds that: (1) the City has invested substantial time and

16  money in developing its Marks; (2) Shah appropriated and used the City's Marks at little or no cost

17  relative to the City's ; (3) the City did not authorize or consent to the Marks appropriation and use; and

18  (4) the City was injured by the appropriation and use.

19  112.     Shah's conduct as set forth above, especially when viewed as a whole, constitutes fraud under the

20  UCL.

21                    *3. Punitive Damages Award for Common Law Unfair Competition*

22  113.     The parties agree that the punitive damages claim is analyzed according to California law. *Bass

23  v. First Pac. Networks, Inc.*, 219 F.3d 1052, 1055 n. 2 (9th Cir.2000).  In an action for the breach of an

24  obligation not arising from contract, where it is proven by clear and convincing evidence that the

25

26

27

28

08cv1211

1  defendant has been guilty of oppression,[18] fraud,[19] or malice,[20] the plaintiff, in addition to the actual

2  damages, may recover damages for the sake of example and by way of punishing the defendant. Cal.

3  Civ.Code § 3294(a).

4  114.    The Court finds by clear and convincing evidence that Shah is guilty of fraud and malice as

5  defined by Cal. Civ.Code § 3294 and punitive damages are warranted.  The Court will assess the punitive

6  damages as discussed below.

7  ### B. The City's Claims of Unfair Competition Under Federal Law

8  115.    The statute governing claims for federal unfair competition (which includes common law

9  trademark infringement) prohibits persons from:

10              using in commerce, any word, term, name, symbol, or device, or any
             combination thereof, or any false designation of origin, false or misleading
11             description of fact, or false or misleading representation of fact, which . . .
             is likely to cause confusion, or to cause mistake, or to deceive as to the
12             affiliation of such person with another person, or as to the origin,
             sponsorship, or approval of his good or services, or commercial activities
13             by another person . . . .

14  15 U.S.C. §1125(a)(1).

15  116.    As set forth above Shah acts constituting unfair competition as expressly prohibited under the

16  Lanham Act have been stipulated to by the parties.[21] Shah's liability for violation of the Lanham Act is

17  established.  The Lanham Act authorizes a permanent injunction to prevent future violations. 15 U.S.C. §

18  1116(a).

19  117.    Shah intends to use the Marks and the Logo in connection with sale of goods and services in

20  commerce in a manner that has and will likely (a) cause confusion, or cause mistake, or deceive as to the

21  affiliation, connections, or association of Shah with the City and its golf course; and (b) to cause

22

23      [18] "Oppression" means despicable conduct that subjects a person to cruel and unjust hardship in
    conscious disregard of that person's rights. Cal. Civ. Code § 3294(c)(2).

24

25      [19] "Fraud" means an intentional misrepresentation, deceit, or concealment of a material fact
    known to the defendant with the intention on the part of the defendant of thereby depriving a person of
    property or legal rights or otherwise causing injury. Cal. Civ.Code § 3294(c)(3).

26

27      [20] "Malice" means conduct which is intended by the defendant to cause injury to the plaintiff or
    despicable conduct which is carried on by the defendant with a willful and conscious disregard of the
    rights or safety of others.  Cal. Civ.Code § 3294(c)(1).

28

        [21] See SF 44-51; TE 14-18, 64-67, 69, and 71-78.

1   confusion as to the origin, sponsorship, or approval of Shah's future goods, services, and commercial

2   activities if not enjoined.

3   118.    The City is likely to be further harmed by the foregoing if an injunction is not issued.

4                                    ***COURT'S RULING***

5   **I.        *Injunctive Relief***

6            **A.        *Permanent Injunction***

7   119.    The Court has broad power to fashion injunctive relief to prevent Shah's ongoing acts of

8   infringement, cybersquatting, and unfair competition.  A permanent injunction is authorized on such

9   terms as the Court deems reasonable and necessary to prevent or restrain further infringement of a

10  copyright. 17 U.S.C. § 502(a).  Similarly, the Lanham Act authorizes a permanent injunction to prevent

11  future violations.  15 U.S.C. § 1116(a).  California's UCL also authorizes the Court to enjoin

12  uncompetitive acts, as well as to "make such orders or judgments . . . as may be necessary to prevent the

13  use or employment of any practice which constitutes unfair competition . . .."  Cal. Bus. & Prof. Code §

14  17203.   The Court is afforded wide latitude in fashioning remedies under the UCL.  *See, e.g., Hewlett v.*

15  *Squaw Valley Ski Corp*., 54 Cal.App.4th 499, 537 (1992) (enjoining ski area from tree cutting and further

16  ordering it to "restock, revegetate and reforest the unlawfully cut area . . . .")

17  120.    To obtain a permanent injunction, a plaintiff must demonstrate: (1) that it has suffered an

18  irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to

19  compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and

20  defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a

21  permanent injunction.  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see also Microsoft*

22  *Corp. v. Marturano*, 2009 WL 1530040, *8 (E.D. Cal. May, 27, 2009) ("*Marturano*").

23  121.    As to the first factor, "copyright infringement is presumed to give rise to irreparable injury."

24  *Universal City Studio v. Reimerdes*, 82 F.Supp.2d 211, 215 (S.D.N.Y. 2000). Moreover, where a

25  defendant's acts are willful, as here, the plaintiff need not introduce evidence of a threat of future harm.

26  *See Polo Fashions, Inc. v. Dick Bruhm, Inc.*, 793 F.2d 1132, 1135-1136 (9th Cir. 1986); *Nat'l Football*

27  *League v. McBee & Burno's Inc.*, 792 F.2d 726, 729 (8th Cir. 1986) (citing *Sony Corp. of Am. v.*

28  *Universal City Studios, Inc.*, 464 U.S. 417, 451(1984)).  Furthermore, Shah's use of the Marks and Logo

will cause confusion, mistake, or deception as to the source, origin, or authenticity of the City's Marks and Logo, which clearly give rise to irreparable injury. *See Marturano,* 2009 WL 1530040, *8. Shah's continued attempts to appropriate the City's name for its golf course also threatens to diminish the goodwill the City has established for The Crossings at Carlsbad. A threatened loss of goodwill constitutes irreparable harm supporting an injunction. *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 841 (9th Cir. 2001). Similarly, under the UCL, a permanent injunction is appropriate to prohibit a defendant from continuing to engage in unscrupulous and misleading conduct. *See People v. First Fed. Credit Corp.*, 104 Cal.App.4th 721, 735 (2002). Shah has provided every indication that he intends to continue his misrepresentations in an effort to deceive the public into believing he has an affiliation with the City's golf course.

122.    The second factor, that there is no adequate remedy at law, is also met. Given Shah's behavior to date, there is a continued threat that Shah will continue to engage in such unlawful conduct. The City's injury cannot be remedied by monetary compensation alone. As such, an injunction is the only remedy available to limit the potential of future injury. *See Marturano,* 2009 WL 1530040, *8. In fact, "[e]ven if the defendant has ceased wrongful activities, an injunction should be granted where defendant's intentions are in doubt." 5 J. Thomas McCarthy, *Trademarks and Unfair Competition*, § 30:11 (4th ed. 2011)

123.    The third factor, the balance of hardships, is also satisfied. There is no harm to Shah since an injunction would merely require Shah to comply with the law. *See Capitol Records v. Zahn*, 2007 WL 542816, at *4 (M.D. Tenn. Feb. 16, 2007).

124.    Similarly, the fourth factor, that the public interest would not be disserved by the injunction is also met. "Since Congress has elected to grant certain exclusive rights to the owner of a copyright in a protected work, it is virtually axiomatic that the public interest can only be served by upholding copyright protections and, correspondingly, preventing the misappropriation of the skills, creative energies, and resources which are invested in the protected work." *Marturano*, 2009 WL 1530040, *8 (citing *Apple Computer, Inc., v. Franklin Computer Corp.*, 714 F.2d 1240, 1255 (3rd Cir. 1983)).

125.    Accordingly, the Court finds injunctive relief is proper. IT IS HEREBY ORDERED that Shah, his agents, employees, representatives, and all persons acting in concert with or participating with him or

on his behalf, are hereby enjoined and restrained from engaging in, committing, or performing, directly or indirectly, by any means whatsoever, any of the following acts:

    a.    using, copying, or displaying the City's "THE CROSSINGS AT CARLSBAD" (both the word and the stylized, logo versions) and "TCAC" registered trademarks and service marks (herein, the "Marks"), or any confusingly similar trademarks, service marks, or trade names;

    b.    using copying, displaying, performing, or creating derivative works of, the City's copyright registered logo, depicted below (Diagram 1) (herein, the "Logo");

    c.    registering, attempting to register, acquiring, owning, trafficking, or using an Internet domain name that is comprised in whole or in part of the Marks or any other term or phrase confusingly similar to the Marks;

    d.    doing business or continuing to do business under any business name that is comprised in whole or in part of the Marks or any other term or phrase confusingly similar to the Marks;

    e.    forming any entity with a name that is comprised in whole or in part of the Marks or any other term or phrase confusingly similar to the Marks;

    f.    using any word, term, phrase, name, symbol, or device, including the Marks and Logo, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, that suggests a false designation of origin of Shah's goods or services, or which are likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Shah with the City or the City's golf course, or as to the origin, sponsorship, or approval of Shah's goods, services, or commercial activities by the City;

    g.    using any combination, reproduction, counterfeit, copy or colorable imitation of the Marks or the Logo in connection with advertising, offering for sale, or sale of goods or services the same or similar to those offered by the City, that are likely to be confused with those of the City or the City's golf course, or likely to injure the business reputation of the City or the City's golf course or the reputation of the Marks or the Logo;

08cv1211

h.      using any combination, reproduction, counterfeit, copy, or colorable imitation of the Marks or the Logo in any manner likely to cause confusion, to cause mistake or to deceive;

i.      selling, offering for sale, advertising, promoting, or passing off, inducing or enabling others to sell, offer to sell, advertise, promote, or pass off any goods or services similar to the goods and services provided by the City utilizing the Marks (or trademarks or service marks confusingly similar to the Marks), or the Logo (or derivative works of the Logo);

j.      distributing materials at the City's municipal golf course which are likely to cause confusion, to cause mistake, or to deceive the public with respect to Shah's affiliation with the City or the City's golf course;

k.      committing any acts calculated to deceive the public or to cause purchasers to believe that Shah's goods and services are in any way connected with the City, the City's golf course, or any goods or services offered by the City;

l.      infringing or continuing to infringe the Marks or the Logo or otherwise competing unfairly with the City in any manner;

m.      making or publishing any statements which suggest that Shah has any affiliation with the City or the City's golf course, or which are likely to cause confusion, to cause mistake, or to deceive the public with respect to Shah's affiliation with the City or the City's golf course; and

n.      in any way inducing, encouraging, aiding, abetting, or contributing to any of the aforesaid acts.

**B.      *Transfer or Forfeiture of Domain Names***

126.   Whether framed as additional injunctive relief or as a statutory remedy under the ACPA, the transfer to the City of Shah's infringing domain names is appropriate in this case.  Transfer of the domain names to the owner of the mark is expressly authorized under the ACPA. 15 U.S.C. § 1125(d)(1)(C). Based upon the foregoing, IT IS FURTHER ORDERED that Shah immediately, and in no event later than thirty (30) days following the date of this Order:

08cv1211

a.   take all actions necessary to transfer ownership and control to the City of the domain names listed below, as well as any other domain names owned or controlled by Shah that incorporate or are confusingly similar to the Marks, or which are likely to cause confusion, to cause mistake or to deceive the public with respect to Shah's affiliation with the City or the City's golf course:

www.thecrossingatcarlsbad.com
www.tcac.mobi
www.thecrossingsatcarlsbad.mobi
www.tcacgolf.com
www.thecrossingatcarlsbad.net
www.tcacgolf.mobi
www.thecrossingsatcarlsbadinc.mobi
www.tcacgolf.net
www.golfthecrossingatcarlsbad.com
www.golftcac.mobi
www.golfthecrossingatcarlsbad.mobi
www.crossingsatcarlsbad.com
www.golfthecrossingatcarlsbad.net
www.crossingsatcarlsbad.net
www.golfthecrossingsatcarlsbad.com
www.crossingatcarlsbad.com
www.golfthecrossingsatcarlsbad.mobi
www.crossingsatcarlsbad.mobi
www.golfthecrossingsatcarlsbad.net
www.thecrossingatcarlsbad.mobi

b.   Change the name of the corporations containing the Marks, or any portions of the Marks, to names that do not contain any portion of the Marks, and that are not confusingly similar to the Marks.

**C.    Destruction of All Infringing Materials**

127.   The Copyright Act expressly authorizes impounding and/or destruction of infringing materials. 15 U.S.C. § 503 (b); *see* 15 U.S.C. § 1118.  Based upon the foregoing, IT IS FURTHER ORDERED that Shah immediately, and in no event later than thirty (30) days following the date of this Order, deliver to the City for destruction all materials in Shah's possession, custody, or control bearing or displaying the Marks or the Logo or any word, term, name, symbol, or representation or combination thereof similar to the Marks or the Logo.

**II.    Statutory Damages**

**A.    Copyright Infringement**

128.     The City seeks statutory damages under Section 504 of the Copyright Act, however, Title 17 U.S.C. § 412(2) provides that no award of statutory damages or of attorney's fees, as provided by sections 504 and 505, shall be made for any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work.

129.     As set forth above, the City's registration was not made within three months of the date of first publication and Shah began his infringing activity before the effective registration date, and repeated the same infringing activity thereafter, making all of Shah's infringing activities one continuing infringement under § 412, which precludes recovery of statutory damages and attorney's fees sought by the City for Shah's copyright infringement.

### B.     Statutory Damages Under the ACPA

130.     The City has elected statutory damages as its measure of damages under the ACPA.  The ACPA authorizes statutory damages in the amount of not less than $1,000 and not more than $100,000 per domain name, as the court considers just.  15 U.S.C. § 1117(d).

131.     The City filed its applications for these marks in July 2007. The City's Marks and the Logo were registered by the USPTO in November 2010.[22]  The Plaintiff contends that it is entitled to an earlier notice date of October 20, 2009, as this is the date that the Court ruled finding the City to be the rightful owner of these marks. While the caselaw is clear that registration cannot be applied retroactively to the date of application when applying § 1117[23], the Plaintiff requests constructive registration as of the

---

[22] While the City and its agents were already using the marks "THE CROSSINGS AT CARLSBAD" and "TCAC" for its golf course and related goods and services, the nine Intent to Use ("ITU") trademark applications filed with the USPTO for the Marks and for its Logo were not granted until November 2010. (SF No. 29.)

[23] Many courts have held that statutory damages are not retroactively available for infringement occurring between application and registration. *See, e.g., Sly Magazine, LLC v. Weider Publ'ns LLC*, 241 F.R.D. 527, 530 (S.D.N.Y.2007) (denying plaintiff's motion to amend in part because "[p]laintiff is unable to allege direct infringement of its registered mark because there can be no liability based on retroactive registration of a trademark ."); *Reliable Tire Distrib., Inc. v. Kelly Springfield Tire Co.*, 592 F.Supp. 127, 136 (E.D.Pa.1984) (holding that the plaintiff could not recover damages because "[a] registrant cannot recover damages or lost profits prior to the date of registration of the mark." In *Reliable Tire*, the plaintiff applied for trademark registration in 1972, but the USPTO did not issue registration until 1976. *Reliable Tire*, 592 F.Supp. at 136. In the meantime, the first act of infringement had taken place, and the court precluded the plaintiff from recovering damages under § 1117 as it was not swayed by the fact that the plaintiff was unable to collect damages due to the USPTO's delay.

1  Court's ruling of the City's partial motion for summary judgment, Doc. No. 26, finding Plaintiff to be the

2  rightful owner of the Marks and Logo.[24] *McCarthy on Trademarks*, § 19:144 (emphasis added); *see also*

3  *GTFM*, 215 F.Supp.2d at 306 (stating that for any infringement occurring before date of mark's

4  registration, plaintiff could recover profits and damages under 15 U.S.C. § 1125(a), but for all

5  infringement occurring after date of registration, plaintiff had to satisfy notice requirements of § 1111 to

6  recover profits and damages). Clearly Shah had notice as of the October 20, 2009 ruling by this Court

7  that: 1) the City was the rightful owner of the Marks at issue in this case; 2) registration of the Marks by

8  the City was to be granted by the USPTO per the order of the Court.

9  132.    Shah originally registered the domain names in November 2006 and then re-registered five

10  domain names in February 2009. Shah continued to operate at least two domain names which incorporate

11  or closely resemble the Marks after the Court's October 20, 2009, summary judgment ruling, Doc. No.

12  26. (SF 50 and 51.) Using the summary judgment date as the starting point for clear egregiousness, the

13  Court concludes that $50,000 in statutory damages should be assessed for each of these.  In total, the City

14  is entitled to recover a total of $100,000 in statutory damages under the ACPA, which amount is

15  appropriate in light of the policy purpose of Section 1117, and Shah's blatant and persistent disregard of

16  the City's rights.

17         *C.    Punitive Damages for Common Law Unfair Competition*

18  133.    California Civil Code Section 3294(a) provides that in an action for the breach of an obligation

19  not arising from contract, where it is proven by clear and convincing evidence that the defendant has

20

---

21         *See also Synergy Tech & Design, Inc. v. Terry*, 2007 WL 1288464, at *4-5 (N.D. Cal. May 2,
22   2007) (granting plaintiff's motion to amend after finding that defendant would not be prejudiced by
    amendment because "there is no potential for [plaintiff] to recover under the new cause of action for
23   federal trademark infringement for conduct that occurred prior to the registration of the subject
    marks."); *IMAF, S.p.A. v. J.C. Penney Co., Inc.*, 1989 WL 541268, at * 3 (S.D.N.Y. May 15, 1989)
24   (rejecting argument that "registration should be applied retroactively from the date of filing.").

25         [24] See Order dated October 20, 2009, Doc. No. 12 at p. 12, stating:
             Thus, the Court DECLARES Plaintiff the rightful owner of the trademarks
26           and logo at issue in the present case. The Court therefore AUTHORIZES
             the United States Patent and Trademark office to DENY registration of
27           Defendant's trademark applications, Serial Nos. 77/054111, 77/054126,
             77/061706, 77/202046, 77/2037554, and 77/284659, and REGISTER
28           Plaintiff's trademark applications, Serial Nos. 77/230889, 77/230864,
             77/240017, 77/238790, 77/235270, 77/326199, 77/263971, 77/263925,
             and 77/263996.

1  been guilty of oppression, fraud, or malice, the plaintiff may recover damages for the sake of example

2  and by way of punishing the defendant. *Id.*

3  134.   "An award of punitive damages requires the plaintiff to prove that defendant was guilty of

4  oppression, fraud, or malice, and acted with the intent to vex, injure, or annoy, or with a conscious

5  disregard of plaintiff's rights." *Fleming v. Safeco Ins. Co. of America, Inc.*, 160 Cal.App.3d 31, 43 (1984).

6  135.   Under California law, when assessing punitive damages courts are to consider: (1) the degree of

7  reprehensibility of the defendant's conduct; (2) the amount of compensatory damages awarded to the

8  plaintiff; and (3) the wealth of the defendant. *Neal v. Farmers Ins. Exchange*, 21 Cal.3d 910, 928, 148

9  Cal.Rptr. 389, 582 P.2d 980 (1978); *see Harrell v. Kepreos*, No. CIV S-06-0849, 2008 WL 619117, at *4

10  (E.D.Cal. Mar.4, 2008).

11  136.   With regard to the first factor, the Court finds that Shah acted fraudulently, with a malicious

12  intent in conscious disregard of the City's rights.

13  137.   As to the second factor, as indicated above, the Court has awarded $100,000 to the City in

14  statutory damages under the ACPA.  The City has not, however, specified the amount of punitive

15  damages they seek.

16  138.   Looking at the final factor, which focuses on Shah's financial condition, the City has not provided

17  any evidence on this factor. The California Supreme Court has indicated that evidence of a defendant's

18  financial condition is a prerequisite to an award of punitive damages in order to ensure that the award

19  will actually serve to deter the defendant's conduct. *Adams v. Murakami*, 54 Cal.3d 105, 119, 284

20  Cal.Rptr. 318, 813 P.2d 1348 (1991). Without such information, the Court cannot determine the

21  appropriate amount of punitive damages necessary to properly punish and deter Shah from future

22  misconduct. *See id.* at 110, 284 Cal.Rptr. 318, 813 P.2d 1348. Consequently, because the City has not

23  met its burden of producing evidence on this factor, the Court hereby DENIES WITHOUT PREJUDICE

24  the City's request for punitive damages and GRANTS the City leave to marshal evidence relating to

25  Shah's financial condition.  The City must file any renewed request for punitive damages, that is properly

26  supported,  on or before March 1, 2012.  Shah's response must be filed on or before March 8, 2012.

27  **III.   ATTORNEYS' FEES**

28  **A.   Attorneys' Fees Under the Copyright Act.**

08cv1211

1  139.   Title 17 U.S.C. § 412(2) provides that no award of statutory damages or of attorney's fees, as

2  provided by sections 504 and 505, shall be made for any infringement of copyright commenced after first

3  publication of the work and before the effective date of its registration, unless such registration is made

4  within three months after the first publication of the work.

5      **B.   *Attorneys' Fees Under the Lanham Act and ACPA***

6  140.   The Lanham Act and the ACPA provide that "the court in exceptional cases may award

7  reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a).  While the statute does not

8  explicitly define the term "exceptional," generally a trademark case is exceptional for purposes of an

9  award of attorneys' fees when the infringement is malicious, fraudulent, deliberate or willful.  *Playboy*

10 *Enterprises, Inc. v. Baccarat Clothing Co.*, 692 F.2d 1272, 1276 (9th Cir. 1982); *Securacomm*

11 *Consulting, Inc. v. Securacom Inc.*, 224 F.3d 273, 280 (3d Cir. 2000).

12 141.   Shah engaged in willful infringement. If Shah's bad faith alone were not sufficient to make this an

13 exceptional case, the continuing infringing conduct after the October 20, 2009 Order, its conduct during

14 discovery, and its perjury during deposition and at trial make this an exceptional case.

15 142.   The City's request for attorney fees under the ACPA is GRANTED. In light of the apportionment

16 requirements set forth above, the City's declaration in support of its request for attorneys fees should set

17 forth only those attorneys fees incurred for the ACPA claims. The City will submit an application,

18 properly supported, for the amount of its fees and costs on or before February 23, 2012. Shah will submit

19 any opposition to the amount requested on or before March 8, 2012.

20                  ***Conclusion***

21      On the City's request for Injunctive relief, the Court finds injunctive relief is proper and as such,

22 IT IS HEREBY ORDERED that Shah, his agents, employees, representatives, and all persons acting in

23 concert or participating with him or on his behalf, are hereby enjoined and restrained from engaging in,

24 committing, or performing, directly or indirectly, by any means whatsoever, any of the acts set forth

25 above.

26      On the City's request for an order requiring the transfer of the domain names from Shah to the

27 City, the Court finds such transfer to be expressly authorized under the ACPA. 15 U.S.C. §

28 1125(d)(1)(C).  As such, IT IS FURTHER ORDERED that Shah immediately, and in no event later than

1  thirty (30) days following the date of this Order, take all actions necessary to transfer ownership and

2  control to the City of the following domain names:

3
>                     www.thecrossingatcarlsbad.com
>                     www.tcac.mobi
4                     www.thecrossingsatcarlsbad.mobi
>                     www.tcacgolf.com
5                     www.thecrossingatcarlsbad.net
>                     www.tcacgolf.mobi
6                     www.thecrossingsatcarlsbadinc.mobi
>                     www.tcacgolf.net
7                     www.golfthecrossingatcarlsbad.com
>                     www.golftcac.mobi
8                     www.golfthecrossingatcarlsbad.mobi
>                     www.crossingsatcarlsbad.com
9                     www.golfthecrossingatcarlsbad.net
>                     www.crossingsatcarlsbad.net
10                    www.golfthecrossingsatcarlsbad.com
>                     www.crossingatcarlsbad.com
11                    www.golfthecrossingsatcarlsbad.mobi
>                     www.crossingsatcarlsbad.mobi
12                    www.golfthecrossingsatcarlsbad.net
>                     www.thecrossingatcarlsbad.mobi

13

14       On the City's request for an order requiring Shah change the name of the corporations containing

15  the Marks, or any portions of the Marks, to names that do not contain any portion of the Marks, and that

16  are not confusingly similar to the Marks.  The Court hereby GRANTS this request and ORDERS Shah,

17  his agents, employees, representatives, and all persons acting in concert with or participating with him or

18  on his behalf, to change the name of the corporations containing the Marks, or any portions of the Marks,

19  to names that do not contain any portion of the Marks, and that are not confusingly similar to the Marks.

20       On the City's request for an order requiring the destruction of all infringing material, the Court

21  hereby GRANTS the Plaintiff's request and ORDERS Shah immediately, and in no event later than thirty

22  (30) days following the date of this Order, deliver to the City for destruction all materials in Shah's

23  possession, custody, or control bearing or displaying the Marks or the Logo or any word, term, name,

24  symbol, or representation or combination thereof similar to the Marks or the Logo.

25       On the City's claim for Copyright Infringement and request for statutory damages and attorneys

26  fees, the Court finds: 1) that the City's registration was not made within three months of the date of first

27  publication; 2) Shah began his infringing activity before the effective registration date and repeated the

28  same infringing activity thereafter, making all of Shah's infringing activities one continuing

1   infringement; and 3) Title 17 U.S.C. § 412 precludes recovery of statutory damages and attorney's fees

2   sought by the City for Shah's copyright infringement. The City's request for statutory damages and

3   attorneys fees for its copyright infringement claims are DENIED.

4          On the City's claims for violations of the ACPA and request for statutory damages and attorney

5   fees, the Court finds that statutory damages in the amount of $100,000 in statutory damages is

6   appropriate in light of the policy purpose of Section 1117, and Shah's blatant and persistent disregard of

7   the City's rights.  The City's request for attorney fees under the ACPA is GRANTED. In light of the

8   apportionment requirements set forth herein, the City's must submit an application, properly supported,

9   for the amount of fees and costs requested on or before February 23, 2012. Shah will submit any

10  opposition to the amount requested on or before March 8, 2012.

11         On the City's request for punitive damages, the Court cannot determine the appropriate amount of

12  punitive damages necessary to properly punish and deter Shah from future misconduct, because the City

13  has not met its burden of producing evidence on this factor, the Court hereby DENIES WITHOUT

14  PREJUDICE the City's request for punitive damages and GRANTS the City leave to marshal evidence

15  relating to Shah's financial condition.  The City must file any renewed request for punitive damages, that

16  is properly supported,  on or before March 1, 2012.  Shah's response must be filed on or before March 8,

17  2012.

18         A hearing is hereby set for March 16, 2012 at 1:30 p.m. to determine and set the attorneys fees

19  and punitive damages to be awarded.

20         IT IS SO ORDERED.

21

22  DATED:  February 9, 2012

23                                                    _____

24                                                    Hon. Anthony J. Battaglia
                                                      U.S. District Judge

25

26

27

28